1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

DRUT TECHNOLOGIES, INC.,                          NO.

10

        Plaintiff,                                **COMPLAINT**

11

    v.                                            DEMAND FOR JURY TRIAL

12

MICROSOFT CORPORATION, INC.,

13

        Defendant.

14

15

16

        Plaintiff Drut Technologies, Inc. ("Drut"), by and through its attorneys of record,

17

Williams Kastner & Gibbs, PLLC, and Shlansky Law Group, LLP (*pro hac vice* admission

18

forthcoming), hereby states and alleges as follows:

19

                              I.      **BACKGROUND**

20

        1.      This action concerns Microsoft Corporation's ("Microsoft") surreptitious

21

misappropriation of Drut's valuable and novel software and hardware, which it misled Drut and

22

convinced Drut to provide to Microsoft, that was ultimately used to conceive (and build), upon

23

information and belief, Microsoft's newest cloud-based server architecture using such

24

information that it accessed from Drut.

25

**COMPLAINT** - 1

2.      Drut was founded in 2018 by Jitender K. Miglani, Founder and President, who conceived proprietary, innovative technologies to improve efficiency in cloud-based data centers.

3.      Drut's innovation – a set of computer algorithms and a configuration of software and hardware components – was designed to reduce inefficiencies in cloud-based servers.  A cloud-based server is one that may involve a virtual server, which is built, hosted, and delivered via a cloud computing infrastructure over the internet, and is accessed remotely.

4.      Cloud-based servers are often inefficient due to unused cloud resources.  A cloud resource refers to a computer's capabilities such as networks, storage, accelerators, or other elements.  Cloud resources become unused if a specific workload does not require them (*i.e.*, the bandwidth of a workload does not use all resources).  For example, if a user needs storage, but does not use accelerators, the accelerator resources are unused.

5.      Drut's technology allows for reconfiguration of cloud architectures to provide for disaggregation of cloud-based resources so that data centers can be efficient in their use of cloud-based resources (*i.e.*, avoid unused resources).  For example, Drut's technology allows for servers to be built so that only the resources needed by a user at a particular time or for a particular task are drawn upon, and the servers can be reconfigured, thus reducing unused resources.

6.      Drut's technology is a key to allowing interconnection between computers to achieve the efficient utilization of cloud-based resources.

7.      While a disaggregated server configuration (that can adapt to user workloads) is not in itself a novel concept, the way it is implemented in a reconfigurable manner by Drut is novel.  Drut, upon information and belief, is the first company that was able to build such a connection between two field-programmable gate array ("FPGA") cards connected remotely.  An FPGA exists on a circuit board that allows for re-programming after manufacturing.  FPGAs

COMPLAINT - 2

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

1    are designed with logic structures, known as gates, including programmable elements and

2    interconnects, establishing pathways for data to perform multiple or complex functions. Drut's

3    algorithms allows for reconfiguration of the interconnects across an optical link.

4        8.      Microsoft, which hosts a cloud computing service called Microsoft Azure

5    ("Azure"), recognized the importance and benefit of Drut's technology and engaged Drut to

6    work on a project ("The Project").

7        9.      The Project involved the parties' execution of a Master Supplier Services

8    Agreement, dated November 20, 2019 (the "MSSA"), which was subsequently informed by a

9    Statement of Work, dated December 4, 2019 (the "SOW").

10       10.     The goal of The Project was to provide for disaggregation of cloud-based

11   resources by pooling them to be available as necessary, and to reduce waste and redundancy in

12   existing architectures.

13       11.     If The Project was successful, it would reduce the need for certain resources, such

14   as servers and energy usage, and enhance speed and user experience.

15       12.     For a large-scale cloud provider like Azure, this would reduce capital expenditure,

16   potentially by billions of dollars, and provide Microsoft with a competitive advantage over other

17   cloud service providers.

18       13.     Microsoft's cloud business appears to be responsible for the largest portion of its

19   revenue, according to its recent earnings reports, and its competitive advantages, which apply to

20   processing conducted in proprietary centers, and are the basis for a large portion of its revenue

21   and earnings growth.

22       14.     In fact, based on information and belief derived from Microsoft's own modeling,

23   the market opportunity for The Project ranged from $100 million to billions of dollars in annual

24   value in terms of smaller numbers of servers, smaller physical facilities, less electricity to operate

25   the units, less electricity to cool the facilities, *etc*.

**COMPLAINT** - 3

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

15.     Beginning in 2019, Microsoft sought to engage Drut to refine Drut's hardware and software to apply to Azure's network of servers.

16.     Microsoft and Drut developed economic modeling for servers to be constructed by Drut for Microsoft that reflected hundreds of millions of dollars of licensing revenue to Drut, if Drut were to license its technology to Microsoft.  Neither of the people negotiating or forming the business dealing between the parties actually believed or understood that Drut had licensed any technology to Microsoft, except the limited items arising from the paid work.

17.     Instead, Microsoft deliberately misappropriated Drut's valuable and novel software and hardware, and ultimately, upon information and belief, built its newest cloud-based server architecture using the information that it learned from Drut, including hardware (and field programmable gate array/register-transfer level) that Microsoft solicited from Drut.

18.     Specifically, Microsoft engaged in a pattern of frustrating Drut's ability to perform under the MSSA and SOW by requiring changes, constricting time and monetary resources, and refusing to compensate Drut for the work it had done, all while mining Drut's confidential information and while stringing Drut along to develop, in parallel, a cloud-based server based on the information Microsoft had accessed from Drut, and Microsoft's use of Drut's technology during The Project.

19.     In fact, during April 2020, Microsoft was actively touting the extraordinary results that Drut had achieved.  Microsoft also published a video in which the Azure's Chief Technology Officer enthusiastically championed what Drut's work could do, except that he claimed it to be Microsoft's.  This video featured the actual device that Drut physically shipped to Microsoft in April 2020, with its novel hardware and software enclosed, to demonstrate its technology to Microsoft.  Whether unwittingly or knowingly, this enthusiastic endorsement was for exactly the product that Drut had provided, that the technical and program staff at Microsoft

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

1   had previously induced Drut to work on with Microsoft, on the expectation of Microsoft

2   licensing the technology and buying its servers from Drut.

3        20.    Despite using Drut's intellectual property and work enclosed in the device,

4   Microsoft was actively representing to Drut, including in writing, that it was not using Drut's

5   work or prior-developed technology.  Now, Microsoft also claims that that technology was

6   irrevocably licensed to Microsoft in any event based on a supposed license that even Microsoft's

7   own program staff never believed when they were developing economic models for Drut to be

8   paid hundreds of millions of dollars for (before, during, and after contract and expectation

9   formation).

10        21.    Upon information and belief, Microsoft's misappropriation of Drut's trade secrets

11   and contrived theory that it obtained an irrevocable license as part of a sleight of hand in its

12   documents (that its own team never imagined) is part of a pattern of Microsoft seeking to obtain

13   broad intellectual property rights for nominal payments.

14        22.    Drut brings this lawsuit to prevent Microsoft from continuing to misappropriate

15   Drut's novel confidential information, which constitutes trade secrets, and to prevent Microsoft

16   from wrongfully using Drut's confidential information to develop and enhance its cloud-based

17   servers.

18        23.    Drut also brings this lawsuit to recover for Microsoft's failure to perform its duties

19   under the parties' MSSA and SOW, and for Microsoft's misuse of an amendment to the MSSA

20   and SOW to refuse to pay Drut for the work it completed.

21        24.    Microsoft's continuing disregard for Drut's intellectual property and contractual

22   rights constitutes misappropriation of trade secrets, breach of contract, breach of the implied

23   covenant of good faith and fair dealing, and unfair competition, and otherwise entitles Drut to

24   relief in *quantum meruit* or unjust enrichment.

25

**COMPLAINT** - 5

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

1

## II.   JURISDICTION AND VENUE

2       25.     The Court has jurisdiction over Microsoft pursuant to 28 U.S.C. § 1332(a),

3   because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and

4   because Drut and Microsoft are citizens of different states.  *See* Section III ¶¶ 28, 29, *infra.*

5       26.     In addition, this is an action for trade secret misappropriation under state trade

6   secrets law and the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836 *et seq.*), declaratory

7   judgment pursuant to the Declaratory Judgment Act (28 U.S.C. § 2201), as well as state and

8   common law claims for breach of contract, breach of the implied covenant of good faith and fair

9   dealing, unfair competition, *quantum meruit*, and unjust enrichment.  This Court has jurisdiction

10  pursuant to 28 U.S.C. §§ 1331 and 1367(a).

11      27.     Venue in this case is proper in this District and before this Court pursuant to 28

12  U.S.C. §§ 1391(b), (c), and 1400(b), because Microsoft resides and conducts business in the

13  Western District of Washington.

14                      ## III.   PARTIES

15      28.     Drut is incorporated in Delaware and its principal place of business is in New

16  Hampshire.   Thus, Drut is "a citizen of" either Delaware or New Hampshire.  *Accord* 28 U.S.C.

17  § 1332(c)(1).

18      29.     Microsoft is incorporated in Washington state and its principal place of business

19  is in Redmond, Washington.  Thus, Microsoft is "a citizen of" Washington.

20      30.     The Parties are diverse under 28 U.S.C. § 1332(a)(1).

21                  ## IV.   FACTUAL ALLEGATIONS

22  **A.   Industry Background and Drut's Technology.**

23      31.     Today's computer servers are often cloud-based, as described above, meaning

24  that they can be accessed remotely over the internet.

25

**COMPLAINT** - 6

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

1    32.    In such cloud-based servers, the components that store data, process graphics, or

2    other information on a computer that can be accessed by a user (*i.e.*, the resources) are generally

3    located on a computer's motherboard.

4    33.    These resources generally include Central Processing Units ("CPUs") and

5    memory, which are found on every laptop and desktop; Graphics Processing Units ("GPUs"),

6    which allow a user to see graphics on a laptop or desktop; Solid State Storage Devices ("SSDs"),

7    which allow for a computer to store information; and specialized accelerators or smart

8    networking interface cards, which allow a computer to perform repetitive tasks. These resources

9    are hardware elements.

10   34.    When these resources are on the same motherboard, they communicate with each

11   other, which allows a computer to operate and be used.

12   35.    A virtual machine can either run off of a single motherboard and access these

13   resources as local components, or clusters of these virtual machines can be used to service a

14   bigger workload and access distributed resources as needed, rather than limiting a virtual

15   machine only to the resources on a single, local motherboard.

16   36.    If a resource is not utilized fully, it can become inefficient and "fragment," which

17   can cause a server to perform work slower and negatively affects users of a cloud-based server.

18   37.    Today, upon information and belief, many cloud servers end up resulting in at

19   least some poorly or unused resources, and generally only 30%-40% of a server's overall

20   resources are utilized at any given time.

21   38.    Drut's key technologies are its algorithms with software and hardware elements,

22   which provide a solution that allows for more efficient use of cloud-based resources and reduce

23   fragmentation of resources.

24   39.    Drut's algorithms use a mix of software builds (a build refers to activity to

25   translate readable source code into a program) that runs off of programmable FPGA cards and

**COMPLAINT** - 7

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

1    other hardware to fix the resources' inefficiency by disaggregating the resources, essentially

2    drawing on certain resources from a larger pool, as needed, to facilitate pooling of resources into

3    coupled clusters.

4        40.    In other words, the resources are grouped so that they can be used on-demand

5    without having to soak up the totality of a server.  This results in higher utilization of these

6    elements (up to 100%).

7        41.    Drut's technology, which uses optically disaggregated GPUs, enables the use of

8    resources that are positioned at greater distances apart than otherwise possible.   Server

9    components are typically housed in a box where they must fit tightly together, which imposes

10   design limitations for organizing and arranging servers and other components, especially in large

11   operations.   Using Drut's approach, these resources can be hundreds of meters apart (and

12   potentially greater distances), but once connected, they work as if they are local.  This allows for

13   more efficient use of these resources when there are varying workload requirements.   For

14   example, a workload that requires more graphics resources can use specialized GPUs without

15   other elements of unitized servers being left idle.

16       42.    The impact of this disaggregated approach is ubiquitous across all kinds of data

17   centers in commercial enterprises, cloud providers, research computing, and government and

18   educational institutions.

19       43.    Drut's technology, with its foundation of proven and mature manufacturing

20   processes, provides a significant economic benefit for the future of data center architecture.  A

21   data center is the location where a large number of computer systems are stored.

22       44.    There have been various approaches and attempts by companies to improve

23   effective utilization of these resources, and, in fact, companies have tried to build various custom

24   solutions.  But, due to rigidity in connectivity around the resources, and higher economics of

25   overall solutions, practical real disaggregation between CPUs, GPUs, and SSDs had not been

**COMPLAINT** - 8

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

effectively achieved specifically for any large-scale data center until Drut developed the technology to achieve such results.

45.     Drut's algorithms, and software and hardware components are trade secrets that have significant monetary value to Drut (and others in the trade), and as such, Drut guards its key technologies closely to maintain its proprietary interests.

46.     Drut protects its trade secrets, confidential, and proprietary information through a variety of mechanisms.  For example, Drut uses a secure computer network with a VPN protocol and SSH keys required for login and any access, physical servers in a secure location protected by firewall software, and secure office space with electronic keycards required for entry.  Drut further requires execution of non-disclosure agreements by all employees, companies, or individuals to whom it provides confidential information or trade secrets to.  The algorithms themselves are used in private facilities that are not exposed to public or customer access, meaning that the market is especially conducive to effective trade secret protection, if confidentiality obligations are abided.

**B.      Drut Developed a Relationship with Microsoft.**

47.     Recognizing the need for a more efficient disaggregated cloud-based servers, in 2019, Microsoft engaged Drut and the parties entered into the MSSA to develop a project, through a cooperative technical endeavor, referred to above and herein as The Project.

48.     Drut's owner, Jitender Miglani, was the primary negotiator for Drut regarding the scope of The Project and the parties' relationship with Bryan Tuttle and Joy Fan, who were the program sponsors from Microsoft.  Mr. Miglani also discussed these and other terms with Harish Sachidanandan, then a business development manager for Microsoft.  Through their communications, the parties shared a clear understanding that Microsoft would not have a license to use Drut's intellectual property until the parties entered into a separate agreement, which never happened.

**COMPLAINT** - 9

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

49.     In fact, the MSSA specific contemplates a separate licensing agreement.  MSSA § 12(h) ("[t]his Agreement does not replace any separate written license agreement between Microsoft and Supplier, and any conflicts with licensing of Microsoft Materials will be resolved as provided in Section 3(b)(1)(ii).").

50.     In fact, the Microsoft program leads themselves knew and expected, and led Drut to believe, that Drut was not conveying or licensing its core background technology, and created economic models showing Microsoft paying Drut hundreds of millions of dollars for large quantities of servers, with such projections and statements being made before, during, and after the signing of the MSSA.

51.     The MSSA points to a statement of work, an SOW, that would govern The Project.

52.     Neither the MSSA nor SOW provided that time was of the essence.

53.     The Project was implemented by Drut and Microsoft to develop a product using other companies' (including Xilinx, Inc.'s) FPGA cards and hardware, and Drut's preexisting and new software.

54.     The Project was specifically beneficial to Microsoft to attain know-how to allow it to provide disaggregated servers in the cloud marketplace and address critical fragmentation issues currently found in the cloud computing marketplace.

55.     All representatives of the parties involved in the contract negotiations understood that Drut was working on creating a new product that would involve hardware and software components, and that such product would entail Drut's existing intellectual property, as well as Microsoft's, including new intellectual property that Drut would assist Microsoft with developing.

56.     Specifically, Drut had developed certain intellectual property and trade secrets prior to engaging with Microsoft, including optically disaggregated GPUs and source code

**COMPLAINT** - 10

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

1   described above, that runs off of programmable FPGA cards and hardware to fix a resource's

2   inefficiency by disaggregating these resources, essentially drawing on certain resources from a

3   larger pool, as needed, to facilitate pooling of resources into coupled clusters over a flexible

4   transport by connecting two FPGA cards in a reconfigurable manner.

5       57.    The parties understood that Drut would retain ownership of its pre-existing

6   intellectual property.

7       58.    The MSSA provided that each party would "own and retain all rights" to its pre-

8   existing intellectual property or any intellectual property owned prior to the execution of the

9   MSSA.  MSSA § 3(a).

10      59.    Section 3(a) of the MSSA also evidences that the parties understood that Drut's

11  preexisting software and intellectual property would not be licensed to Microsoft without a

12  royalty or fee.  In addition, Section 3(c) of the MSSA also reflected an understanding that the

13  parties would discuss any license terms as a separate matter:  "Unless the parties agree on written

14  license terms, Supplier grants Microsoft and its Affiliates a worldwide, nonexclusive, perpetual,

15  irrevocable, royalty-free, fully paid-up right and license . . . ."  The Microsoft program leads

16  specifically discussed with Drut that this clear, subsequent, royalty-bearing license was needed

17  and would be negotiated, and even discussed the economic modeling of that later arrangement.

18      60.    The parties further understood that the intellectual property involved, including

19  Drut's pre-existing intellectual property, was highly confidential.  The MSSA contains strict

20  confidentiality protections and states, as to Drut's intellectual property as the "Supplier," that:

21          '*Supplier IP*' means (1) Supplier's pre-existing or independently
            developed IP and (2) any third-party IP with respect to which
22          Supplier has sufficient rights to grant to Microsoft the license and
            sublicense rights contemplated in this Agreement.
23
            '*Supplier Materials*' means any technology created by a Supplier or
24          third-party prior to or outside of the course of any Microsoft SOW,
            but which may be necessary or useful for achieving the requirements
25          of a Microsoft SOW (including hardware, software, source code,

**COMPLAINT** - 11

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

documentation, methodologies, know how, processes, techniques, ideas, concepts, technologies, and data).

MSSA § 1(p).

61.     Information shared by Drut with Microsoft under the MSSA and SOW was subject to a Non-Disclosure Agreement ("NDA"), and each party agreed to hold information shared in confidence and not disclose such information to third parties:

> During the Term[1] plus 5 years, the parties will hold in strictest confidence and not use or disclose to any third-party any Confidential Information of the other party.
>
> A party will consult with the other if it questions what comprises Confidential Information.   Confidential Information excludes information known to a party before the disclosing party's disclosure to the receiving party, or information publicly available through no fault of the receiving party.

MSSA § 6(a)(2), (3).

62.     The SOW breaks down Drut's Deliverables into 5 "Milestones."   Initially, Milestone 1 was due by December 31, 2019; Milestone 2 by January 31, 2020; Milestone 3 by February 28, 2020; Milestone 4 by April 20, 2020; and Milestone 5 by May 29, 2020.

63.     The SOW required that Microsoft pay Drut for each Milestone: $300,000 for Milestone 1; $200,000 for Milestone 2; $300,000 for Milestone 3; $200,000 for Milestone 4; and $200,000 for Milestone 5.

64.     Each Deliverable was accepted by Microsoft within 15 business days after receipt, unless Microsoft expressly rejected a Deliverable.

65.     The MSSA provides:

> **Acceptance of Deliverables.**   Unless otherwise agreed, Microsoft may evaluate each Deliverable and accept or reject it within 15 business days after receipt.  If Microsoft does not accept or reject within that time period, the Deliverable is deemed accepted. Supplier will fix rejected Deliverable within 10 business days after notice of rejection from Microsoft ('*Correction Period*').   If Supplier does not fix the Deliverable within the Correction Period,

---

[1] The MSSA defines the "Term" as five years from the effective date (five years from November 20, 2019).

**COMPLAINT** - 12

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

Microsoft will have no obligation with respect to that Deliverable and Supplier will promptly refund Microsoft Fees paid for that Deliverable within 15 days following the end of the Correction Period.

MSSA § 2(f).

66. In accordance with the SOW, Drut completed a significant portion of the work on The Project on time, and Microsoft admitted that Drut had accomplished Milestones 1 and 2. Microsoft did not reject the Deliverables for Milestones 1 and 2. Microsoft and, in some cases, both parties, delayed the start of The Project while they resolved certain background issues and ambiguities resulting in delay of starting performance, which both parties accepted as faultless, in late 2019 and early 2020.

67. However, after Drut's completion of Milestone 2, Microsoft abruptly refused to continue to work cooperatively with Drut, including, among other actions, purporting effectively impose several additional material conditions, rendering Drut's ability to complete remaining parts of its work under the SOW impossible, or at best, extremely difficult.

68. Despite Microsoft's noncooperation, Drut continued to work under the SOW, and completed additional portions of the Milestones with the exception of specific parts of the Milestones that it was unable to complete due to Microsoft's refusal to work with Drut. Despite Drut's efforts to complete the Milestones, Microsoft, in late spring 2020, adopted a hostile approach and unilaterally decided that Drut had "run out of time" and would not be paid for its work on the other Milestones.

69. The several Microsoft program leads that had previously been supportive took a newfound hostile tone, implying that Drut was misperforming, and later suggesting that Drut's whole approach was unworkable and uninteresting to Microsoft. They then proceeded to pretend, falsely, that Drut's technology would not be used, and then, when caught red-handed

**COMPLAINT** - 13

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

otherwise, claimed that Microsoft had the right to use it, and that all that talk about licensing it (if used) was Drut's sorry confusion.

**C.    Microsoft Breached Its Obligations Under the MSSA and SOW.**

70.    The Project was a mutual, cooperative endeavor, and much of the performance by Drut was accompanied by a need for input from Microsoft – which Microsoft initially provided, and then abruptly stopped.

71.    For example, part of the SOW required that the parties cooperate to develop "Specifications" that were essential to the overall progress of The Project.

72.    Microsoft acknowledged that these Specifications were a moving target in response to issues and opportunities that arose throughout The Project.

73.    The Specifications were approved by both parties on February 29, 2020, and memorialized in a written document.

74.    The February 29, 2020, approval date of the Specifications and the need for the Specifications reflected that the requirements in the MSSA and SOW were insufficient for Drut to complete any of the Milestones beyond the first Milestone, in accordance with the originally-contemplated timing.

75.    Due to the complexity of creating the Specifications, they were not completed until February 29, 2020, one day after what was stated as Milestone 3's original completion date.

76.    At the time that the Specifications were approved, Milestone 2 (out of 5) had not yet been completed since the Specifications were vital to Drut's continued work on Milestone 2.

77.    The timing of the finalizing of the Specifications naturally caused some consequence to the SOW's schedule, which had initially contemplated an overall completion of The Project by May 29, 2020.

**COMPLAINT** - 14

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

1   78.   Moreover, beyond the delay caused by the Specifications, in March and April of

2   2020, the parties realized that other assumptions that the parties had made when drafting the

3   SOW needed to be changed.

4   79.   For example, Microsoft made the decision to switch from the licensed technology

5   that was proven to work on a Xilinx card, and instead insisted on working with less-functional,

6   but royalty-free technology, on off-the-shelf FPGA cards.   Microsoft thereby insisted on a

7   material change in the hardware platform.

8   80.   Drut's platform was built and functioned on a VCU108 board (a development

9   board manufactured by Xilinx).  Microsoft insisted on switching to a VCU117 (another type of

10   card manufactured by Xilinx, but in a different product-type family).   FPGAs in different

11   families may be programmed differently.

12   81.   Microsoft then insisted on switching to a Sidewinder card manufactured by Fidus

13   Systems, Inc. (compatible with Xilinx products, but in yet another product-type family).

14   82.   Drut was required to transition from VCU108 to VCU117 and then to Sidewinder

15   at Microsoft's direction, because Microsoft happened to have some of these different cards in

16   stock or would procure them as Microsoft deemed fit for their internal programs, which Drut did

17   not have any visibility concerning.   This decision to change the hardware platform was

18   effectively imposed by Microsoft, and created consequences in the sequencing in work under the

19   SOW that delayed and hindered Drut's ability to complete the Milestones within the SOW's

20   schedule.

21   83.   The MSSA allowed Drut to perform with the royalty-bearing equipment, and the

22   change frustrated this performance and was an attempt to change the Specifications midstream.

23   84.   While Microsoft could request a "Change Order" to amend the MSSA, it did not

24   do so.  Instead, it told Drut that it must use the less-functional FPGA components, yet insisted

25   on compliance within the SOW's schedule.

**COMPLAINT** - 15

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

85.     The changes imposed by Microsoft had consequences.  For example, the intended cost-saving measure of using a royalty-free card failed because the card did not function correctly, as Drut anticipated, a fact that Drut had previously brought to Microsoft's attention.

86.     This switch to different FPGA cards also required radical revisions to vast quantities of already completed work by Drut.  For example, Drut's engineering team of 8 engineers had to work 80-hour weeks for at least 8 weeks, at a total cost of an additional approximately $768,000 to accommodate Microsoft's unagreed demands.  Despite never agreeing to do so, Drut performed this additional work in an attempt to vindicate The Project and the parties' intended collaborative working relationship.  This was also because Microsoft made it clear that these imposed changes were mandatory, despite them being material changes in the Specifications.

87.     These changes further required a commensurate amount of additional contract performance time to complete the additional work necessitated by Microsoft's imposed changes.  Microsoft and Drut both understood that a commensurate adjustment of time would be required.

88.     Drut adapted to Microsoft's changes based on the complexities that resulted from an aggressive timeline for The Project.  This made the original schedule unachievable due to Microsoft's failure to identify concrete deliverables and Specifications; refusal to cooperate; and unilateral, cardinal changes, which delayed the SOW's timeline.

89.     In addition to its imposed changes to The Project, Microsoft was nonresponsive at extensive times, and failed to engage in face-to-face meetings with Drut, including when Drut made efforts to arrange for a more economic licensing of the FPGA cards.  Microsoft's non-responsiveness and lack of cooperation consumed weeks of additional overtime work by Drut's team and interfered with and frustrated Drut's performance of The Project.

90.     Bryan Tuttle, who was one of Drut's primary contacts at Microsoft, admitted to Mr. Miglani that Microsoft failed to engage with Drut to finalize the Specifications timely and

**COMPLAINT** - 16

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

1  to manage timing expectations within his team in light of the required changes in The Project

2  and other complexities.

3       91.     Microsoft's lack of cooperation and non-responsiveness was in breach of Section

4  3 of the SOW, which provides that Microsoft "agrees to cooperate on the resolution of issues

5  impacting the development schedule, compliance with requirements and quality of the overall

6  solution."  SOW § 3.

7       92.     It was understood by the parties that Microsoft would pay Drut for all work that

8  Drut performed due to Microsoft's imposed changes to the scope of the work.[2]

9       93.     The SOW provides that "Microsoft will only make payment for Services that

10  Supplier [Drut] has completed and delivered to Microsoft, and that Microsoft has accepted."

11  SOW § 4(a).

12      94.     Even given Microsoft's changes, Drut successfully completed Milestone 2 in

13  April of 2020.  Milestone 2 was acknowledged in writing as having been completed on April 24,

14  2020.  In fact, prior to April 24, 2020, Microsoft had orally acknowledged that Drut had fully

15  performed Milestone 2.

16      95.     Although Microsoft acknowledged that Drut completed Milestone 2, and thus

17  owed Drut payment for Milestone 2, Microsoft told Drut that it would not pay for the work that

18  Drut had completed on Milestone 2 until Drut entered into an amendment to the SOW on other

19  topics.

20      96.     In effect, Microsoft leveraged a threat of continuing an unjustified and coercive

21  non-payment for completed work in order to extract material changes to the parties' existing

22  contract, without new consideration, by way of an amendment.  While that amendment contained

23

24  _____

25  [2] The MSSA specifically provides that Drut will not be paid for "researching, reporting on, or correcting invoice related errors."  MSSA § 4(b).  Thus, if Microsoft intended for Drut not to be paid for rework or additional work needed due to Microsoft's changes to the scope of the agreement, Microsoft would have indicated so in the written agreements.

**COMPLAINT** - 17

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

some benign terms, and some adaptation for things unknowable at the MSSA's outset, it also substantially extracted new value from Drut that was not volunteered — hence the coercive leverage on the non-payment.

97.     Due to Microsoft's threat of non-payment for Drut's completion of work on Milestone 2, Drut was required to enter into an amendment to the SOW on April 24, 2020, characterized as a signed "Change Order Form" that recast the pathway of The Project, and purported to change the parties' obligations (the "Amendment").

98.     As part of the Amendment, Microsoft also forced Drut to provide access to *its* source code and know-how to Microsoft, including documentation of how its source code operates, including physical devices and simulators of its source code.  That source code and know-how was acknowledged to be Drut's intellectual property, and was protected under an NDA between the parties, dated April 24, 2019.

99.     Microsoft used the Amendment as a coercive tactic to force Drut to give Microsoft its source code in exchange for payment regarding Milestone 2, which Microsoft already owed Drut under their existing contract, as was admitted then by Microsoft.

100.     Payment for Milestone 2 was not made until after Drut had signed the Amendment in mid-April, which Microsoft itself did not sign until April 24, 2020 (even though Microsoft prepared and sent the form on or about March 18, 2020).

101.     Instead of working with Drut to complete Milestone 3 after Microsoft's imposed changes discussed above, which caused Drut to expend significant additional resources, Microsoft falsely claimed that Drut had run out of time to complete the work under the SOW, and refused to pay Drut for the remaining work that it had completed.

102.     The original SOW allowed 29 days from the completion of Milestone 2 until the completion of Milestone 3, and then another 51 days for the completion of Milestone 4, and an additional 39 days for the completion of Milestone 5.  The deliverables for Milestones 2 through

**COMPLAINT** - 18

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

5 were altered by the Amendment on April 24, 2020 (despite the putative dating of the Amendment on March 18, 2020). From Microsoft's acknowledgement that Drut completed Milestone 2, the respective day-for-day intervals for the remaining Milestones (3 through 5) that were gated by Microsoft's approval of Milestone 2 would have been:

- +29 days to Milestone 3, or May 23, 2020;

- +51 days to Milestone 4, or July 13, 2020; and

- +39 days to Milestone 5, or August 21, 2020.

103.    Drut finished all of the items in Milestones 3, 4, and 5 in June 2020, minus some aspects that were unattainable due to Microsoft's insistence on using unspecified, and unagreed, FPGA cards.

104.    After Drut completed its work timely, Microsoft then asked Drut not to submit invoices for the work done on Milestones 3, 4, and 5 at the end of June 2020, but to wait until July 2, 2020. After Drut did so, Microsoft informed Drut in July 2020 that, as of the fiscal year changeover on June 30, 2020, there was no billable project open, and that its invoices no longer had the ability to be paid. Microsoft clarified that this "technical issue" somehow also meant that Microsoft was refusing to pay Drut at all for any of its extensive work on Milestones 3, 4, or 5.

105.    Only after Microsoft had affirmatively represented that it would pay Drut did Joy Fan of Microsoft write to Drut on July 17, 2020, that: "Drut continued to miss deadlines and failed to provide complete deliverables to Microsoft. For instance, Milestone 3 should have been completed at the end of February of this year, and while we tried to work with you so that you had the time to correct the deliverables for Milestone 3, we still have yet to see all of the completed deliverables as listed in the Change Order Form."

106.    That statement by Ms. Fan was not only untrue, but it was refuted by Microsoft's own agreement to the Specifications on February 29, 2020, and drafting of the Amendment that

**COMPLAINT** - 19

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

1   recast the content of Milestones 3 through 5 as being future work on April 24, 2020.  The

2   Amendment necessarily changed the deadlines for Milestones 3 through 5 because it changed

3   the scope of Drut's work and required additional performance in connection with Milestones 3

4   through 5.  Moreover, the Amendment was not executed until *after* the originally contemplated

5   deadlines for those Milestones had already passed, per the SOW, and thus Drut could not begin

6   these Milestones until after April 24, 2020, when the Amendment was finally executed by

7   Microsoft.

8          107.   This e-mail from Ms. Fan came more than 15 days after Drut provided the

9   Deliverables under Milestones 3 through 5 to Microsoft in June 2020, and therefore, the

10  Deliverables had already been deemed accepted pursuant to Section 2(f) of the MSSA.

11         108.   Drut timely performed the totality of the work for Milestones 3 through 5, with

12  the exception of some aspects of the work, which were unachievable due to Microsoft's

13  insistence on using an FPGA card that did not function the same as the previous FPGA cards

14  that the parties understood would be used at the time the MSSA was executed.  This was

15  especially so given the significant and fundamental changes to the work (and timing) imposed

16  by Microsoft and given that the MSSA does not contain a "time is of the essence" clause.

17         109.   Microsoft was required to pay Drut's invoice received on July 2, 2020, because

18  Drut performed the work, submitted the invoices timely, and Microsoft accepted Milestones 3

19  through 5.  *See* MSSA § 4(d) (Microsoft is not obligated to pay invoices received 120 days after

20  Drut was required to invoice Microsoft).

21  **D.     Drut's Disclosure to Microsoft of Confidential Information and Trade
           Secrets was subject to the NDA.**

22

23         110.   The MSSA provides that:

24         During the Term plus 5 years, the parties will hold in strictest confidence and <u>not
           use</u> or disclose to any third-party any Confidential Information of the other party.

25

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

A party will consult with the other if it questions what comprises Confidential Information. Confidential Information excludes information known to a party before the disclosing party's disclosure to the receiving party, or information publicly available through no fault of the receiving party.

MSSA § 6(a)(2), (3) (emphasis added).

111.    The NDA further provides that Drut and Microsoft, including its affiliates, will not "disclosure the other's confidential information to third parties" and will "use and disclose the other's confidential information only for purposes of [their] business relationship with each other." NDA § 3(a).

112.    Starting in late April 2020, subject to the NDA and in accordance with the Amendment and in response to Microsoft's threats and demands, Drut began disclosing to Microsoft its confidential information and trade secrets that Microsoft insisted on accessing from Drut.

113.    Drut's coerced disclosure of its source code to Microsoft allowed Microsoft to learn how to connect two FPGA cards in a reconfigurable manner (optically disaggregate GPUs), which Microsoft was unable to do successfully prior to receiving Drut's source code. Microsoft had no right to misuse Drut's confidential and trade secret information in this manner, having received no license rights from Drut.

114.    In addition to disclosing to Microsoft its highly-sensitive source code and know-how, Drut also supplied Microsoft with considerable confidential and trade secret information concerning the design, structure, and operation of the flexible transport, and know-how generally, including a proprietary software and hardware configuration.

115.    For example, in April 2020, in accordance with the Amendment, Drut shipped Microsoft a software and hardware configuration so that Microsoft could see Drut's technology in action. Before Drut shipped this device, it took photos of the device, which had a unique

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

location, type, and three-dimensional tying of wires using twist ties, which is the same unique configuration visible in the video.[3]

116.     After Drut provided this software and hardware configuration to Microsoft in April and May 2020, Microsoft initially cooperated in furthering The Project.  Drut continued to deliver on its end of the bargain until it was no longer able to do so due to Microsoft's noncooperation, as described above.

117.     Eventually, after Microsoft had what it wanted from Drut – that is, Drut's novel technology and a way to implement it – upon information and belief, Microsoft began to use Drut's source code and algorithms to misappropriate Drut's trade secrets and develop a server using Drut's technology.

118.     Despite Microsoft's believed use of Drut's source code and other trade secrets and confidential information, Microsoft affirmatively misrepresented on July 17, 2020, that "there is no other strategic initiatives [sic] that will be using [Drut's] work."

119.     Despite affirmatively representing that Microsoft was not using Drut's trade secrets and intellectual property, Drut learned that, after it sent its device to Microsoft in April 2020, and later its source code which operated on such device, Microsoft was actively touting the extraordinary results that Drut had achieved, and, later prepared a video that it posted publicly on YouTube, demonstrating the exciting things that Drut's work could do while using the actual device Drut has shipped to Microsoft after being coerced into signing the Amendment.

120.     Specifically, in October 2020, Drut learned of videos posted in the public domain on YouTube by Mark Russinovich, the Chief Technology Officer of Microsoft Azure, the large-scale cloud provider developed by Microsoft on September 22-24, 2020.  In one video titled

---

[3] Drut has since requested that Microsoft return this device, and more importantly, Drut's source code, but Microsoft has refused to do so, although it has not paid even for the lesser services bargained for.  But for Microsoft's demand for the Amendment to extract the source code to release payment that was already fully accrued and owed, Microsoft would not have been able to use Drut's technology to conceive and build Microsoft's newest cloud-based server architecture.

**COMPLAINT** - 22

*Inside Azure Datacenter Architecture*, Mr. Russinovich exposed a disaggregated rack architecture that he characterizes as a highly innovative and efficient adaptation.[4]

121.     Mr. Russinovich stated, "This requires some kind of groundbreaking technology," including a disaggregated server and software, which implements a protocol to connect different elements through FPGA cards to other FPGA cards on other elements of a server, as if the elements were local (this process is described in detail below).

122.     The video shows details that Drut shared with Microsoft beginning in May 2020 under strict confidentiality obligations.  Specifically, it shows diagrams of a flexible transport connecting two FPGA cards in a reconfigurable manner, exactly what Drut had shown to Microsoft earlier in 2020.

123.     Upon information and belief, the video reflects that Microsoft began to use Drut's technology as soon as it coerced Drut into sending it to Microsoft under the Amendment, to inform its approach or to develop a comparable solution, which impermissible use of Drut's intellectual property and trade secrets violates Washington and federal law, as well as Microsoft's contractual non-disclosure obligations.

124.     Mr. Russinovich continued in the video to talk at some length about the exciting and innovative things that this new configuration can do.  He also demonstrated these inventive matters.  However, Mr. Russinovich's video implemented Drut's technology, which neither Microsoft nor Azure had any right to use, without acknowledgement of, or permission from, Drut.  To the extent that Microsoft relies on any supposed irrevocable license as set forth in the MSSA, Microsoft never received any such license, including because it never paid any license fee (or paid the other consideration, either).

---

[4] The original video was removed, but a replacement video dated October 15, 2020, is available here: https://www.youtube.com/watch?v=bV2Rb_LJRQ4.

**COMPLAINT** - 23

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

125.    In fact, one part of the video shows the actual devices that Drut physically shipped to Microsoft in April 2020, which included Drut's novel software and source code, which source code was shipped to Microsoft separately, to demonstrate Drut's technology to Microsoft per the Amendment.  It is evident that the device in Mr. Russinovich's video (shown below) is the same device that Drut shipped to Microsoft because of photographic evidence.

126.    The below picture shows this exact unit Drut sent to Microsoft, a computer server (the large upright tower on the table), with an optical cable attached to it that has an FPGA card attached to that cable, which is then connected to the configuration sitting on the table (where another FPGA card is attached).  In the picture, the GPU is located where the optical cable is attached to the hardware on the table.

127.



COMPLAINT - 24

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

128.     This video shows the actual software and hardware configuration that Drut sent to Microsoft in April 2020, which was a configuration that Microsoft was unable to achieve and which it accessed from Drut.   This demonstrates Microsoft's misappropriation of Drut's technology, which Microsoft labeled "Azure Servers" on the video caption on YouTube.

129.     Microsoft's public touting of Drut's configurations also reflects that Drut's technology and ideas worked (or Microsoft would not have publicly claimed it as its own).

130.     Microsoft's publication of the exact configuration that Drut used also publicly disclosed Drut's valuable trade secrets, as these devices and configurations are customarily kept in secure facilities in the extremely competitive and trade secret-protective cloud services business.

131.     Diagram 1 below reflects Drut's visual representation of what its technology is capable of.   Specifically, the yellow squares reflect the FPGA cards on the resources (CPUs, GPUs, SSDs, and Accelerators) and the yellow lines show various possible connections between the FPGA cards.   This connection is reprogrammable – a function of Drut's algorithms and source code.

132.

**DIAGRAM 1 - DRUT'S REPRESENTATION**



Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

133.    Diagram 2 below reflects Microsoft's apparent version of Drut's software, using the information learned from Drut as the basis for its illustration.  Specifically, in Diagram 2 Microsoft shows stacks of resources (in Microsoft's version, the resources are called CPUs, DRAMs, GPUs, and storage racks, connected in the same was as represented in Drut's Diagram).

**DIAGRAM 2 - AZURE'S REPRESENTATION**



134.    Diagram 3 reflects how the disaggregation and rapid connection/reconnection works.  Specifically, Diagram 3 reflects a reconfigurable connection using FPGA cards between the resources.  Much like in Drut's representation in Diagram 1, there is a CPU side which shows an "initiator" (*i.e.*, user).  Azure's representation then shows an "Optical Connector" connecting the FPGA card on the CPU side to the GPU side (*i.e.*, what is shown in Drut's diagram as the yellow lines connecting the resources).  This "Optical Connector" represents where Drut's software runs on FPGA cards to connect the resources.

**COMPLAINT** - 26

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

135.

## DIAGRAM 3 – AZURE'S REPRESENTATION



136.     The above three Diagrams reflect that Microsoft, upon information and belief, used Drut's intellectual property and trade secrets, without permission, while simultaneously misrepresenting to Drut that its trade secrets and source code (or any of its developed technology) were not being used by Microsoft.  Specifically, the above Diagrams reflect that Microsoft was actively touting what it had learned from Drut — how to connect two FPGA cards in a reconfigurable manner (optically disaggregate GPUs), which Microsoft was unable to do successfully prior to receiving Drut's source code.  Moreover, Microsoft's videos use the same exact device Drut shipped to Microsoft, reflecting Drut's proprietary configuration.

**COMPLAINT** - 27

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

## V.   CAUSE OF ACTION - COUNT I:
## DECLARATORY JUDGMENT

137.   Drut restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

138.   An actual controversy exists between Drut and Microsoft regarding whether Microsoft has a putative irrevocable, "fully paid-up" license to, among other things, reproduce, modify, format, or otherwise use the Deliverables which include Drut's intellectual property. MSSA § 3(c)(2).

139.   Drut informed Microsoft that it would receive no license under the MSSA and that a separate agreement would be required, but no subsequent agreement was ever reached.

140.   The parties' actions confirm that they understood that neither the SOW nor the MSSA would convey any license to Microsoft.

141.   The SOW and MSSA do not provide for a license fee separate from the fee structure based on the Milestones.  Any putative right to the license contemplated in Section 3(c)(2) of the MSSA required that Microsoft pay Drut the full consideration for the Milestones that entailed that work or any license to Drut's own property, which it never did.

142.   Microsoft has failed to pay Drut the full consideration for any license fee, or even pay for the Milestones (3, 4, and 5) under which it purported (per a coerced Amendment lacking in consideration) to require Drut to deliver its source code.

143.   Further, the breaches of contract described in Count IV comprised material breaches by Microsoft that relieved Drut's further contractual performance under Washington law, including any putative license.  Drut's continued performance thereafter was coerced under the strain of the need for payment to meet contractor and employee obligations, which payment was never received in any event (itself a material breach, that again relieved further performance).  To the degree that Drut also voluntarily performed after Microsoft's prior,

COMPLAINT - 28

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

material breaches, Microsoft was fully aware of (and manipulatively used) Drut's intention to work with Microsoft's baseless and knowing misinterpretations of the MSSA (and the forced Amendment) to try to be flexible with a demanding and inflexible massive corporate entity.  Drut throughout conveyed concern and reserved its rights, and did not waive its elective remedies under Washington contract law, including rescission under the prior, material breach doctrine.

144.    An actual controversy also exists between Drut and Microsoft regarding whether any of the putative obligations in the Amendment were binding on Drut.

145.    Microsoft demanded that Drut agree to the Amendment under threat that, if Drut refused, it would not be paid for Milestone 2, which Microsoft acknowledge had been successfully completed.  That is, Microsoft did not agree to pay Drut anything beyond what was already owed, rendering it without legal consideration.

146.    The Amendment was not binding on Drut because it was not supported by any new consideration.

147.    Pursuant to 28 U.S.C. § 2201, Drut requests that the Court declare that: (a) Microsoft's failure to pay Drut for Milestones 3 through 5 negates any right to the license contemplated in Section 3(c)(2) of the MSSA; and (b) the obligations set forth in the Amendment do not bind Drut because the Amendment was not supported by valid consideration or was the product of undue influence, coercion, or other improper means.

## VI.    CAUSE OF ACTION - COUNT II:
### TRADE SECRET MISAPPROPRIATION IN VIOLATION OF
### THE DEFEND TRADE SECRETS ACT

148.    Drut restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

149.    Drut owns trade secrets relating to disaggregated cloud-based servers and optically disaggregated GPUs.  Specifically, Drut owns trade secrets and other intellectual property such as source code and algorithms that allow for reconfiguration of computer

COMPLAINT - 29

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

architectures to provide for disaggregation of cloud-based resources so that data centers can be more efficient in their use of cloud-based resources and avoid unused resources.

150.   Under federal law, direct copying, reverse-engineering, or other usage of Drut's trade secrets and other intellectual property, constitutes misappropriation.

151.   As explained in detail above, Microsoft improperly used Drut's trade secrets and intellectual property that Drut had disclosed to Microsoft pursuant to strict confidentiality obligations under the MSSA, NDA, and SOW.

152.   Drut provided Microsoft with access to dozens of documents, physical technologies, and code scripts reflecting Drut's trade secrets and proprietary analyses on numerous topics, including Drut's disaggregation.

153.   For example, Azure's Chief Technology Officer, Mr. Russinovich, publicly disclosed Drut's technologies and claimed that it was Azure's technologies, not Drut's, without Drut's permission.

154.   Drut vigilantly protected its trade secrets through limited disclosures on an as-needed basis, disclosing information only pursuant to strict non-disclosure agreements, providing materials through due diligence through a secure data room, and requiring its employees to enter into non-disclosure agreements and non-competition agreements.

155.   Drut's trade secrets hold tremendous value, and their misappropriation by Microsoft is giving Microsoft a significant competitive advantage.

156.   The misappropriation by Microsoft was willful and malicious.

157.   The ongoing, improper use of Drut's trade secrets by Microsoft has proximately caused Drut damages in an amount to be established at trial.

158.   Microsoft has claimed that it is not using Drut's intellectual property or trade secrets, and also made misleading statements that it had gone in a whole other direction due to Drut's technology failing, but also claims that it has the right to do so under the MSSA, which

**COMPLAINT** - 30

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

Drut disputes.  This misdirection included Microsoft agents making clear statements that Drut's technology was scrap, that Microsoft was going in a whole different technological direction with disgust and disdain for Drut's benighted ideas, and embarrassed silence when presented with the video testimonial of the highest technologist in their worldwide business about exactly Drut's technology.

159.     The video published by Azure's Chief Technology Officer demonstrates that Microsoft was, upon information and belief, actually using Drut's proprietary hardware and software configuration, which Drut built and shipped to Microsoft.  Specifically, the exact same device that Drut has photos of prior to sending to Microsoft appears in Azure's video, which is evidenced by the unique tying of wires that appears on the device.

160.     The simultaneous suggesting that Drut's technology was a failure that Microsoft refused to pay for, followed by the spontaneous and open touting of Microsoft's most senior technologist evinces attempts at deception in furtherance of misappropriation, and suggests the bad faith and malice of Microsoft's conduct.

161.     Any use of Drut's intellectual property and trade secrets by Microsoft is an impermissible use.  That is true whether Microsoft incorporated Drut's technology into Azure's server networks directly, or used Drut's technology to inform its approach or to develop a comparable solution.

162.     To the extent that Microsoft claims to have a putative, irrevocable "fully paid-up" license to, among other things, reproduce, modify, format, or otherwise use the Deliverables which include Drut's intellectual property, Microsoft has failed to pay the full consideration for any license fee.  MSSA § 3(c)(2).

163.     Upon information and belief, when Microsoft enters into a "fully paid up" license, the contract providing for such license usually specifies a license fee.

**COMPLAINT** - 31

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

1   164.   The SOW and MSSA do not provide for a license fee separate from the fee

2   structure based on the Milestones.  Any putative right to the license contemplated in Section

3   3(c)(2) of the MSSA required that Microsoft pay Drut the full consideration for the Milestones

4   that entailed that work or any license to Drut's own property, which it never did.

5   165.   The contemporaneous, lulling statements about a separate license entailing

6   hundreds of millions of dollars in revenue before, during, and after contract formation – by the

7   same persons creating the contract for Microsoft – shows the lack of belief, even by Microsoft,

8   that it was bargaining for or creating a meeting of the minds to take or license Drut's technology,

9   at least unless and until it entered into a contemplated, yet separate, subsequent license

10  agreement.  Both Microsoft program leads discussed at length the pricing requirements for the

11  servers incorporating Drut's technology, and a rolling phase-in schedule for them to enter service

12  in Microsoft's data centers, including extensive financial modeling and discussion conducted

13  after the MSSA was signed.  A third Microsoft manager, a Senior Manager, clarified

14  that a license fee would have to be built into the cost of each fixed-cost server using Drut's

15  solution for The Project, but there would also be a separate license fee to Drut if the technology

16  were to be incorporated elsewhere in Microsoft's other projects and business lines.

17  166.   Much of the technology and intellectual property that Microsoft misappropriated

18  was entailed in Milestones 3-5.  For example, for Milestone 3, the Amendment putatively

19  obligates Drut to provide its source code to Microsoft (which Microsoft also told Drut was a

20  condition of the payment for Milestone 2, which had already been earned and was already due

21  and payable).

22  167.   Microsoft's failure to pay actual consideration for any license fee negates any

23  contractual right to Drut's technology that Microsoft purports to have.

24  168.   In addition to monetary damages for Microsoft's previous misappropriation of

25  Drut's trade secrets and proprietary information and technology, Drut seeks an injunction to:

COMPLAINT - 32

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

i.  Prevent Microsoft from any further use or disclosure of Drut's trade secret information;

ii.  Forbid Microsoft from making or selling the cloud-based server or providing cloud-based services to its customers proven to improperly include Drut's trade secrets or be premised on Drut's trade secrets (including developments consequential to developmental misuse of same); and

iii.  Require Microsoft to recall and destroy all products or intangible products such as cloud-based servers proven to include or derive from such trade secrets improperly.

169.  Pursuant to 18 U.S.C. § 1836(3)(A), Drut is also entitled to exemplary damages in an amount not to exceed twice its actual damages.

170.  Pursuant to 18 U.S.C. § 1836(3)(D), Drut is entitled to an award of its attorneys' fees.

171.  If the Court determines that it would be infeasible to prohibit future or ongoing use of Drut's trade secrets by Microsoft, the Court should expressly condition any future use on payment of a reasonable royalty to Drut.

## VII.   CAUSE OF ACTION - COUNT III:
## VIOLATION OF WASHINGTON TRADE SECRETS ACT

172.  Drut restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

173.  Drut owns trade secrets relating to disaggregated cloud-based servers and optically disaggregated GPUs.  Specifically, Drut owns trade secrets and other intellectual property such as source code and algorithms that allow for reconfiguration of computer architectures to provide for disaggregation of cloud-based resources so that data centers can be more efficient in their use of cloud-based resources and avoid unused resources.

COMPLAINT - 33

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

1      174.    Under Washington law, direct copying, reverse-engineering, or other usage of

2    Drut's trade secrets and other intellectual property, constitutes misappropriation.

3      175.    As explained in detail above, Microsoft improperly used Drut's trade secrets and

4    intellectual property that Drut had disclosed to Microsoft pursuant to strict confidentiality

5    obligations under the MSSA, NDA, and SOW.

6      176.    Drut provided Microsoft with access to dozens of documents, physical

7    technologies, and code scripts reflecting Drut's trade secrets and proprietary analyses on

8    numerous topics, including Drut's disaggregation.

9      177.    For example, Azure's Chief Technology Officer, Mr. Russinovich, publicly

10   disclosed Drut's technologies and claimed that it was Azure's technologies, not Drut's, without

11   Drut's permission.

12     178.    Drut vigilantly protected its trade secrets through limited disclosures on an as-

13   needed basis, disclosing information only pursuant to strict non-disclosure agreements,

14   providing materials through due diligence through a secure data room, and requiring its

15   employees to enter into non-disclosure agreements and non-competition agreements.

16     179.    Drut's trade secrets hold tremendous value, and their misappropriation by

17   Microsoft is giving Microsoft a significant competitive advantage.

18     180.    The misappropriation by Microsoft was willful and malicious.

19     181.    The ongoing, improper use of Drut's trade secrets by Microsoft has proximately

20   caused Drut damages in an amount to be established at trial.

21     182.    Microsoft has claimed that it is not using Drut's intellectual property or trade

22   secrets, and also made misleading statements that it had gone in a whole other direction due to

23   Drut's technology failing, but then also claimed that it has the right to do so under the MSSA,

24   which Drut disputes.  This pattern – vigorous insistence that Drut's technology was scrap,

25   followed by silence when caught having brought it to the top of the corporate c-suite and received

**COMPLAINT** - 34

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

1    excited endorsement, and then falsely claiming that it was Microsoft's all along – is a maladroit

2    and maligned show of an intent to deceive in order to take valuable trade secrets.

3         183.   The video published by Azure's Chief Technology Officer demonstrates that

4    Microsoft was, upon information and belief, actually using Drut's proprietary hardware and

5    software configuration, which Drut built and shipped to Microsoft.  Specifically, the exact same

6    device that Drut has photos of prior to sending to Microsoft appears in Azure's video, which is

7    evidenced by the unique configuration of connectors, wires, and configurations that appears on

8    the device.

9         184.   The simultaneous statement that Drut's technology was a failure that Microsoft

10   refused to pay for, followed by the spontaneous and open touting of Microsoft's most senior

11   technologist, suggests the bad faith and malice of Microsoft's conduct.

12        185.   Any use of Drut's intellectual property and trade secrets by Microsoft is an

13   impermissible use.  That is true whether Microsoft incorporated Drut's technology into Azure's

14   server networks directly, or used Drut's technology to inform its approach or to develop a

15   comparable, resulting solution.

16        186.   To the extent that Microsoft might claim to have a putative, irrevocable "fully

17   paid-up" license to, among other things, reproduce, modify, format, or otherwise use the

18   Deliverables which include Drut's intellectual property, Microsoft has failed to pay the full

19   consideration for any license fee, per MSSA § 3(c)(2).  Despite numerous requests, Microsoft's

20   counsel refuses to explain *how* Microsoft could possibly have a right to use Drut's technology,

21   after repeatedly stating that Microsoft was not using it (and acknowledging surprise at the content

22   of CTO Mr. Russinovich's testimonial about Drut's product).

23        187.   Upon information and belief, when Microsoft enters into a "fully paid up" license,

24   the contract providing for such license usually specifies a license fee.

25

**COMPLAINT** - 35

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

1      188.   The SOW and MSSA do not provide for a license fee separate from the fee

2  structure based on the Milestones.  Any putative right to the license contemplated in Section

3  3(c)(2) of the MSSA required that Microsoft pay Drut the full consideration for the Milestones

4  that entailed that work or any license to Drut's own property, which it never did.

5      189.   The contemporaneous, lulling statements about a separate license entailing

6  hundreds of millions of dollars in revenue before, during, and after contract formation – by the

7  same person creating the contract for Microsoft – shows the lack of belief, even by Microsoft,

8  that it was bargaining for or creating a meeting of the minds to take or license Drut's technology,

9  unless and until it entered into the contemplated, subsequent license.

10     190.   Much of the technology and intellectual property that Microsoft misappropriated

11  was entailed in Milestones 3-5.  For example, for Milestone 3, the Amendment putatively

12  obligates Drut to provide its source code to Microsoft (which Microsoft also told Drut was a

13  condition of the payment for Milestone 2, which had already been earned and was already due

14  and payable).

15     191.   Microsoft's failure to pay actual consideration for any license fee negates any

16  contractual right to Drut's technology that Microsoft purports to have.

17     192.   In addition to monetary damages for Microsoft's previous misappropriation of

18  Drut's trade secrets and proprietary information and technology, Drut seeks an injunction to:

19         i.    Prevent Microsoft from any further use or disclosure of Drut's trade secret

20               information;

21         ii.   Forbid Microsoft from making or selling the cloud-based server or providing

22               cloud-based services to its customers proven to improperly include Drut's trade

23               secrets or be premised on Drut's trade secrets; and

24         iii.  Require Microsoft to recall and destroy all products or intangible products such

25               as cloud-based servers proven to include such trade secrets improperly.

**COMPLAINT** - 36

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

193.    Pursuant to RCW 19.108.030, Drut is also entitled to exemplary damages in an amount not exceeding twice its actual damages.

194.    Pursuant to RCW 19.108.040, Drut is entitled to an award of its attorneys' fees.

195.    If the Court determines that it would be infeasible to prohibit future or ongoing use of Drut's trade secrets by Microsoft, the Court should expressly condition any future use on payment of a reasonable royalty to Drut.

## VIII.    CAUSE OF ACTION - COUNT IV:<br>BREACH OF CONTRACT – MSSA AND SOW

196.    Drut restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

197.    Drut and Microsoft entered into the MSSA dated November 20, 2019, and the SOW dated December 4, 2019.

198.    The MSSA and SOW are valid contracts supported by a mutual exchange of consideration and remain in full force and effect.

199.    The MSSA and SOW are governed by Washington law.

200.    Drut has complied with all of its contractual obligations pursuant to the terms of the MSSA and SOW.

201.    The MSSA and SOW do not state that time was of the essence.

202.    As explained in detail above, Microsoft breached its contractual obligations under the MSSA and SOW by, among other things:

i.    Misusing Drut's trade secrets and propriety information, including by using Drut's pre-existing IP despite the clear text of the MSSA in Section 3(a) that Drut continued to own its pre-existing IP and that any license to Microsoft would be the subject of a future agreement;

**COMPLAINT** - 37

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

ii.   Failing to pay for Drut's work performed under the MSSA and SOW (specifically, Microsoft refused to pay Drut for Milestones 3, 4, and 5, despite Drut's timely submission of the invoices and Microsoft's failure to timely reject the Deliverables for these Milestones), in violation of Section 4(a)(1) of the MSSA and Section 4 of the SOW;

iii.   Failing to pay the full consideration required for any putative license under Section 3(c)(2) the MSSA, but nevertheless purporting to exercise the rights of a nonexistent license;

iv.   Representing that that there was going to be a separate licensing agreement and developing an economic model reflecting that Microsoft would pay hundreds of millions of dollars of licensing revenue to Drut, if and when Drut were to license its technology to Microsoft;

v.   Purporting to impose changes to the MSSA and SOW, by way of a coerced and consideration-lacking Amendment, made without consideration, which were extrinsic to the MSSA and frustrated Drut's performance.  Such changes are cardinal changes under Washington contract law and constituted a breach of contract; and

vi.   By refusing to cooperate or respond to Drut's requests for necessary inputs, in breach of Section 3 of the SOW, which provides that Microsoft "agrees to cooperate on the resolution of issues impacting the development schedule, compliance with requirements and quality of the overall solution."  SOW § 3.

203.   The breaches of contract described in Count IV comprised material breaches by Microsoft that relieved Drut's further contractual performance under Washington law, including any putative license.

**COMPLAINT** - 38

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

204.    As a result of Microsoft's breaches of the MSSA and SOW, Drut has suffered damages in an amount to be established at trial.

205.    As a result of Microsoft's breaches of the MSSA and SOW, Drut has also suffered, and continues to suffer, irreparable harm, not fully compensable by damages.

### IX.    CAUSE OF ACTION - COUNT V:
### BREACH OF CONTRACT - NDA

206.    Drut restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

207.    Drut and Microsoft entered into the NDA dated November 20, 2019, and the SOW dated December 4, 2019.

208.    The NDA is a valid contract supported by a mutual exchange of consideration and remain in full force and effect.

209.    The NDA is governed by Washington law.

210.    Drut has complied with all of its contractual obligations pursuant to the terms of the NDA.

211.    As explained in detail above, Microsoft breached its contractual obligations under the NDA by, among other things, misusing Drut's trade secrets and propriety information. Specifically, Microsoft incorporated Drut's technology into Azure's server networks directly, or used Drut's technology to inform its approach or to develop a comparable solution.

212.    The breaches of contract described in Count IV comprised material breaches by Microsoft that relieved Drut's further contractual performance under Washington law, including any putative license.

213.    As a result of Microsoft's breaches of the NDA, Drut has suffered damages in an amount to be established at trial.

**COMPLAINT** - 39

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

214.     As a result of Microsoft's breaches of the NDA, Drut has also suffered, and continues to suffer, irreparable harm, not fully compensable by damages.

## X.     CAUSE OF ACTION - COUNT VI:
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

215.     Drut restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

216.     The MSSA, SOW, and NDA are contracts subject to an implied covenant of good faith and fair dealing.

217.     As described in detail above, Microsoft engaged in a pattern of subversion to seek to undermine or frustrate Drut's performance meanwhile usurping Drut's intellectual property and trade secrets and reaping a windfall through Drut's breakthrough technology that created a vast opportunity that Azure has seized.

218.     For example, Microsoft breached the implied covenant of good faith and fair dealing by frustrating Drut's performance through its refusal to cooperate with Drut to develop specifications and other necessary inputs for Drut to be able to complete the Milestones timely.

219.     Microsoft also breached the implied covenant of good faith and fair dealing by imposing material changes, rendering the original Milestone deadlines impossible to attain. Microsoft also refused to pay Drut for the extensive additional work that Drut had to perform due to Microsoft's cardinal changes.  For example, Drut's engineering team of eight engineers had to work 80-hour weeks for at least eight weeks, at a total cost of approximately $768,000. Microsoft refused to compensate Drut, despite Ms. Fan assuring Drut that budgeting for the project delay had been accounted for.

220.     Microsoft further breached the implied covenant of good faith and fair dealing by purporting to withhold milestone payments that were due to Drut under the MSSA to extract additional conditions from Drut.  For example, Microsoft withheld payment for Milestone 2, and

COMPLAINT - 40

threatened to terminate The Project altogether, unless Drut agreed to give Microsoft its source code.

221.    Mr. Tuttle even informed Drut that the next phase of The Project had been funded, but that it would not go forward, and Drut would not be paid, unless Drut supplied its source code to Microsoft – a new material term that was never agreed to as part of the MSSA or SOW.

222.    Microsoft further breached the covenant of good faith and fair dealing by making lulling statements to Drut about a separate license entailing hundreds of millions of dollars in revenue before to Drut, during, and after contract formation – by the same persons creating the contract for Microsoft.

223.    Microsoft further breached the covenant of good faith and fair dealing by requiring Drut to postpone submission of invoices until July 2, 2020, and then, at that time, refusing to pay Drut on the basis that the billing code had been closed in the intervening time.

224.    As a result of Microsoft's breaches of the covenant of good faith and fair dealing, Drut has suffered damages in an amount to be established at trial.

## XI.    CAUSE OF ACTION - COUNT VII:
## VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT
## (UNFAIR COMPETITION)

225.    Drut restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

226.    As explained in detail above, in its dealings with Drut, Microsoft engaged in unfair competition, in violation of Washington statutory law by: (1) including Drut's software in its cloud-based operating system reserved for Drut under the MSSA; and (2) failing to comply with its contractual and other obligations directed to respecting the confidentiality of Drut's trade secret and confidential information.

227.    In accordance with Washington common law, Drut seeks an order compelling Microsoft to perform its obligations under the MSSA, including *inter alia*:

COMPLAINT - 41

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

i.    Compelling Microsoft to remove those features in its products (and any derivatives thereof) that incorporate any of Drut's trade secrets or confidential information, as well as recall and destroy all remaining stock of any Microsoft products, including products that consistent of intangible services such as server services, that contains any such feature;

ii.    Enjoining Microsoft from making, selling, or using any system or other product that improperly includes any feature reserved exclusive to, or derived from the trade secrets, of Drut; and

iii.    Enjoining Microsoft from using Drut's trade secret information to accelerate its development of competing offerings.

228.    Pursuant to RCW 19.86.090, Drut is entitled to its actual damages, an increase in its damages by up to three times Drut's actual damages, attorneys' fees, and injunctive relief to prevent any ongoing, unfair conduct by Microsoft.

## XII.    CAUSE OF ACTION - COUNT VIII:
### *QUANTUM MERUIT*

229.    Drut restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

230.    As explained in detail above, Microsoft entered into an MSSA, SOW, and Amendment with Drut, which all promised that Drut would be paid for its work performed under such agreements.

231.    Microsoft also elicited work and value from Drut beyond the initial bargain, including in its post-SOW requirements.

232.    The parties understood that Drut would be compensated for the additional work that Microsoft required.

**COMPLAINT** - 42

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

233.    Microsoft refused to pay Drut for the additional work that Drut had to perform due to Microsoft's imposed changes and demands, which included eight engineers working 80-hour weeks for at least eight weeks, at a total cost of approximately $768,000.

234.    Drut is entitled to damages in an amount of be established at trial.

### XIII.   CAUSE OF ACTION - COUNT IX:
### UNJUST ENRICHMENT

235.    Drut restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

236.    By engaging in the conduct described above, including, among other things, refusing to pay Drut for work performed and misappropriating Drut's trade secrets and confidential information without compensation to Drut, Microsoft enriched itself to the detriment of Drut.

237.    Drut invested significant time and resources into performing work towards The Project, which was not required or specified in the MSSA, SOW, or Amendment.

238.    These contracts do not provide that the additional work performed would be without additional compensation.  In fact, when the parties intended for Drut not to be paid for specific work, the parties specified that intent in writing in the MSSA.  *See* MSSA § 4(b) (Drut will not be paid for "researching, reporting on, or correcting invoice related errors.").

239.    To the extent that the work Drut performed is not contemplated in the contracts, Microsoft has been unjustly enriched by accepting said work without payment to Drut.

240.    Drut has not been compensated for any of this additional work.

241.    In addition, Microsoft has been unjustly enriched because it has engaged in unpermitted use of Drut's trade secrets and confidential information, without payment to Drut.

242.    There is no justification for the enrichment to Microsoft and the corresponding harm to Drut.  It would be inequitable to allow Microsoft to obtain the benefits of Drut's

COMPLAINT - 43

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

additional work without just compensation to Drut for its work.  It would also be inequitable to allow Microsoft to profit from its unlawful use of Drut's trade secrets and confidential information.

243.    Drut seeks damages in an amount of be established at trial.

### XIV.    CAUSE OF ACTION - COUNT X:
### CONVERSION

244.    Drut restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

245.    Microsoft – without authorization – misappropriated, and assumed and exercised dominion over, the personal property of Drut, in complete contravention of Drut's rights.

246.    Microsoft converted and is in possession of property belonging to Drut, including, but not limited to, a valuable device consisting of a hardware and software configuration that included simulators of Drut's source code.

247.    Upon information and belief, Microsoft converted Drut's property for its own use. Specifically, Microsoft used Drut's property to learn how Drut's trade secrets and other proprietary source code operated so that Microsoft could replicate Drut's ideas and approaches in Azure's network of servers.

248.    Drut has demanded return of its property, including the physical device shipped to Microsoft in April 2020 and its source code, which Microsoft has refused to do.

249.    As a result of Microsoft's conversion, Drut has suffered damages in an amount to be established at trial.

### XV.    JURY DEMAND

Drut demands a jury trial on all claims so triable.

### XVI.    PRAYER FOR RELIEF

WHEREFORE, Drut prays that the Court grant it the following relief:

COMPLAINT - 44

Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

A.    That the Court issue a declaratory judgment as described above;

B.    Award Plaintiff compensatory, consequential, exemplary, punitive, and multiple damages on all claims, as so permitted on each claim;

C.    Award Plaintiff its prejudgment interest;

D.    That the Court issue permanent injunctive relief to enjoin Microsoft from:

    i.    Ongoing and future use of Drut's trade secrets and confidential information;

    ii.   Producing, manufacturing, installing, distributing, circulating, or using any product, including intangible products such as cloud-based servers, that include any Drut trade secrets or confidential information, or any feature reserved to Drut under the MSSA, SOW, or Amendment; and

    iii.  Requiring Microsoft to recall and destroy all products, including intangible products such as cloud-based servers, proven to include such trade secrets improperly.

E.    Order that Microsoft pay restitution of its profits from the above-described activities;

F.    Order that Microsoft return Drut's trade secrets and other proprietary source code to Drut, including the actual device that Drut physically shipped to Microsoft in April 2020;

G.    Award Plaintiff its attorneys' fees and costs pursuant to RCW 19.86.090 and RCW 19.108.040;

H.    Award Plaintiff any other equitable and injunctive relief necessary to prevent and remedy the anti-competitive conduct alleged herein; and

I.    Such other and further relief as the Court deems just and proper.

**COMPLAINT** - 45

**Williams, Kastner & Gibbs PLLC**
601 Union Street, Suite 4100
Seattle, WA 98101-2380
(206) 628-6600

7508829.1

1    DATED this 10th day of December, 2021.

2
3                                          *s/ Eliot M. Harris*
                                           Eliot M. Harris, WSBA # 36590
                                           *s/ Gabrielle K. Lindquist*
4                                          Gabrielle K. Lindquist, WSBA # 57177
5                                          **WILLIAMS, KASTNER & GIBBS PLLC**
                                           601 Union Street, Suite 4100
6                                          Seattle, WA 98101-2380
                                           Tel:    (206) 628-6600
7                                          Fax:    (206) 628-6611
                                           Email:  eharris@williamskastner.com
8                                                  glindquist@williamskastner.com
9
                                           Colin R. Hagan*, MA BBO #684798
10                                         David J. Shlansky*, MA BBO #565321
                                           **SHLANSKY LAW GROUP, LLP**
11                                         1 Winnisimmet Street
                                           Chelsea, MA 02150
12                                         Tel:    (617) 370-8321
                                           Fax:    (866) 257-9530
13                                         Email:  Colin.Hagan@slglawfirm.com
14                                                 David.Shlansky@slglawfirm.com

15                                         (*pro hac vice* admission forthcoming)

16                                         ***Attorneys for Plaintiff***
17                                         ***Drut Technologies, Inc.***

18
19
20
21
22
23
24
25

**COMPLAINT** - 46                          Williams, Kastner & Gibbs PLLC
                                            601 Union Street, Suite 4100
                                            Seattle, WA 98101-2380
                                            (206) 628-6600

7508829.1